**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| RICHARD RAYMOND QUINTO, JR., | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:17–cv–00024 (JCH) |
| v. | : | |
| | : | |
| NANCY A. BERRYHILL, Acting | : | DECEMBER 1, 2017 |
| Commissioner, Social Security | : | |
| Administration, | : | |
| Defendant. | : | |

**RULING RE: MOTION FOR ORDER REVERSING THE COMMISSIONER'S DECISION (DOC. NO. 19) & MOTION FOR ORDER AFFIRMING THE COMMISSIONER'S DECISION (DOC. NO. 20)**

## I.    INTRODUCTION

Plaintiff Richard Raymond Quinto, Jr., brings this action under section 405(g) of title 42 of the United States Code, appealing from the final decision of the Commissioner of the Social Security Administration ("SSA"), which denied his application for Title II disability insurance benefits and Title XVI supplemental security income.  See Complaint ("Compl.") (Doc. No. 1).  Quinto seeks either reversal or remand of the Decision rendered by Administrative Law Judge ("ALJ") John Noel, which affirms the Commissioner's denial.  See Motion for Order Reversing the Commissioner's Decision ("Mot. to Reverse") (Doc. No. 19).  The Commissioner cross-moves for an order affirming that Decision.  See Motion for Order Affirming the Commissioner's Decision ("Mot. to Affirm") (Doc. No. 20).

For the reasons set forth below, the Motion for Order Reversing the Commissioner's Decision is **GRANTED**.  The Motion for Order Affirming the Commissioner's Decision is **DENIED**.  This case is remanded to the ALJ for proceedings consistent with this Ruling.

1

## II. PROCEDURAL HISTORY

Quinto applied for disability and supplemental security income benefits on November 12, 2014, alleging a disability onset date of June 6, 2002. Certified Transcript ("Tr.") at 20. The Commissioner denied Quinto's application initially on April 9, 2015, and upon reconsideration on August 11, 2015. Id. On August 21, 2015, Quinto requested a hearing with an ALJ, which was held before ALJ Noel on April 7, 2016. Id.

On June 1, 2016, ALJ Noel issued an unfavorable decision for Quinto, affirming the Commissioner's denial and finding that Quinto was not disabled. Id. at 39. Specifically, ALJ Noel found that Quinto's impairments did not meet or equal any listing, see id. at 23–25, and that, with his level of residual functional capacity, there were jobs in the national economy that he could perform, see id. at 25–39. Quinto requested review by the Appeals Court on July 1, 2016, and the Appeals Court denied the request on November 7, 2016. See id. at 1, 15. Following that denial, ALJ Noel's June 1, 2016 Decision became a final decision reviewable by this court. Quinto then filed this appeal on January 5, 2017. See Compl.

## III. FACTS

The parties in this case were unable to stipulate to the facts.[1] Pursuant to this court's Standing Scheduling Order, then, Quinto submitted "a medical chronology with record citations," and the Commissioner responded by indicating "any material omissions or areas of disagreement, again with record citations." Standing Scheduling Order—Social Security Case at III(e). The court summarizes here the relevant facts

---

[1] The court is displeased that the Social Security Administration would not reach an agreement with the plaintiff on the facts and then did not dispute much of those facts.

and indicates when the parties disagree as to those facts. Where no disagreement is noted, the Commissioner has not objected to Quinto's statement of those facts.

Quinto alleged a disability onset date of June 6, 2002, when he was 35 years old. See Memorandum in Support of Motion for Order Reversing the Commissioner's Decision, Summary of Facts ("Mot. to Reverse Mem. Facts") (Doc. No. 19-1) at ¶¶ 1, 3. His only previous relevant work was as a machine operator. See id. at ¶ 4. Both parties agree that Quinto suffers from chronic obstructive pulmonary disease ("COPD"), degenerative disc disease in the lumbar spine, and deep vein thrombosis. See id. at ¶ 5. Quinto also indicates that he suffers from intellectual disability. See id. The Commissioner disagrees with the terminology of "disability" as an issue reserved for the Commissioner, but agrees that Quinto suffers from some Klinefelter Syndrome and has some cognitive slowing. See Response to Plaintiff's Summary of Facts ("Resp. to Facts") (Doc. No. 20-1) at ¶¶ 3, 13.

A.    COPD

With respect to Quinto's COPD, his treating pulmonologist, Dr. Stephen P. Caminiti, recommended on August 6, 2002, that he be removed from his job because of "significant abnormalities in his breathing function." Mot. to Reverse Mem. Facts at ¶ 6. A thoracoscopic lung biopsy on January 13, 2003, revealed that Quinto had reactive pneumonitis. See id. at ¶ 9. Dr. Caminiti opined that Quinto should not be exposed to respiratory irritants, including smokes, fumes, chemicals, odors, or extremes in temperature, and should not participate in physical activity beyond mild exertion. See id. at ¶¶ 12–18. On various occasions, Dr. Caminiti noted that Quinto's condition was chronic and without improvement, resulting in dyspnea, coughing, wheezing, and shortness of breath. See id. at ¶¶ 13–18.

3

Dr. Caminiti prescribed Quinto Advair and Albuterol through a nebulizer, to be used on a daily basis every four hours. See id. at ¶¶ 12, 23. Dr. Nadeem Behjet, Quinto's primary care physician, also noted that Quinto used the nebulizer three to four times a day. See id. at ¶ 23. Quinto testified at the hearing before the ALJ that, since 2002, he used the nebulizer every four to five hours, and occasionally every three hours if needed. See id. at ¶¶ 19–20. He testified that he needed 35 to 40 minutes to complete the treatment each time he used the nebulizer. See id. at ¶ 21. The vocational expert, Steven Sachs, testified that there were no jobs in the economy that could be performed by an individual who needed to use a nebulizer for 40 minutes during each workday. See id. at ¶ 28.

In addition to Dr. Caminiti, other physicians and healthcare professionals also evaluated Quinto's COPD. Dr. Behjet and an APRN, Shawn Putnam, both opined that Quinto could never tolerate exposure to "dust, odors, fumes and pulmonary irritants." Id. at ¶¶ 26, 27. Two state medical consultants, Dr. Firooz Golkar and Dr. Richard Papantonio, also examined Quinto's medical records. See id. at ¶¶ 24–25. Dr. Golkar opined that Quinto should avoid "even moderate exposure" to "fumes, odors, dusts, gases and poor ventilation," and Dr. Papantonio opined that Quinto should avoid all exposure to those same irritants. See id. at ¶¶ 24–25.

The Commissioner adds the following facts that were omitted from Quinto's Summary of the Facts. Dr. Golkar's report indicated that Quinto's COPD was non-severe. See Resp. to Facts at ¶ 8. Dr. Bondus assessed Quinto with "mild to moderate reversible obstructive disease" on October 4, 2002. See id. at ¶12a. Additionally, on several occasions, Dr. Caminiti, Dr. Behjet, and PA Lindsay Smith noted that Quinto's

lungs were clear and that his breathing was normal. See id. at ¶¶ 12c–12k. Finally, on

various occasions, Quinto also reported that he continued smoking, despite Dr.

Caminiti's advice that he quit. See id. at ¶¶ 12b, 12e, 12j, 12k.

B.    Degenerative Disc Disease

Quinto reported lower back pain, including "aching and spasming," on December

10, 2013, to the ProHealth Extended Hours Center. Mot. to Reverse Mem. Facts at ¶

29. Dr. Behjet referred him to physical therapy for his lower back pain on November 7,

2014. See id. at ¶ 30. Dr. Behjet's medical records also indicate neck and hip pain and

tenderness in the lower lumbar area and left lower extremity. See id. at ¶¶ 31, 35–36.

Dr. Behjet noted on December 22, 2014, that Quinto continued to have pain despite

physical therapy and medication. See id. at ¶ 31.

On January 30, 2015, Quinto had an MRI of his lumbar spine done. See id. at ¶

34. The parties disagree as to the conclusions of the MRI. According to Quinto's

presentation of the facts, the MRI showed "mild to moderate disc degeneration with

moderate disc herniation at L4-5 with mass effect on the left L5 nerve root" and "distal

degeneration with mild foraminal stenosis." Id. The Commissioner does not disagree

with the findings of mild to moderate disc degeneration or moderate disc herniation with

mass effect. See Resp. to Facts at ¶ 14. According to the Commissioner, however, the

MRI itself does not indicate stenosis. See id. (citing Tr. at 610, which states "no spinal

stenosis" in Dr. Christopher Leary's report on the MRI). Instead, the Commissioner

argues that the conclusion of "mild foraminal stenosis" is found in Dr. Isaac Moss's

notes "during a subsequent office visit." Id. (citing Tr. at 674).

On April 22, 2017, Dr. Behjet completed a Lumbar Spine Medical Source

Statement. See Mot. to Reverse Mem. Facts at ¶ 37. Dr. Behjet's statement reported

that Quinto suffered from "[l]umbar radiculopathy, leg pain, hip pain and leg swelling," and "shortness of breath with mild to moderate exertion, lower back pain and left leg weakness." Id. Dr. Behjet noted "abnormal gait, reflex changes, tenderness[,] swelling and muscle spasms." Id. (internal quotation marks omitted). As a result, Dr. Behjet concluded that Quinto could not stand for more than 20 minutes at a time, could not stand/walk for more than a total of 2 hours per workday, and would likely be off task for 25% or more of the workday. See id.

The Commissioner adds the following facts that were omitted from Quinto's Summary of the Facts. On several occasions from 2013 to 2015, Quinto reported back pain to Dr. Caminiti and PA Smith, but the examination's findings with respect to his back were normal. See Resp. to Facts at ¶¶16a–16d. Additionally, Quinto reported to Dr. Eric Grahling in April 2015 that physical therapy reduced his pain. See id. at ¶ 16e.

C.    Intellectual Capacity

Quinto has an IQ of 77 and suffers from Klinefelter Syndrome. See Mot. to Reverse Mem. Facts at ¶ 39. Dr. Janine Swanson and Dr. Katrin Carlson, two state psychological consultants, examined Quinto's medical records. See id. at ¶¶ 40–41. Both Dr. Swanson and Dr. Carlson found that Quinto could carry out simple tasks, but would have difficulty performing more complex tasks. See id. Dr. Swanson also found that Quinto would have difficulty performing "adequately in a fast paced, competitive environment." Id. at ¶ 40. Both Dr. Swanson and Dr. Carlson concluded that Quinto could "perform simple, routine, repetitive tasks in a setting that does not require strict adherence to time or production quotas." Id. at ¶¶ 40–41.

The Commissioner adds that another psychologist, Dr. Jaime Burns, examined Quinto on March 16, 2015, and found that Quinto had "average cognitive functioning" and "could follow and understand simple instructions."  Resp. to Facts at ¶ 18a.

## IV.  STANDARD OF REVIEW

Under section 405(g) of title 42 of the United States Code, it is not a function of the district court to review de novo the ALJ's decision as to whether the claimant was disabled.  See Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998).  Instead, the court may only set aside an ALJ's determination as to social security disability if the decision "is based upon legal error or is not supported by substantial evidence."  Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998).  Substantial evidence requires "more than a mere scintilla," but is a "very deferential standard of review."  Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 447–48 (2d Cir. 2012).  It requires "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id. at 448.  If the Commissioner's findings of fact are supported by substantial evidence, those findings are conclusive, and the court will not substitute its judgment for the Commissioner's.  42 U.S.C. § 405(g) (2016); see also Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998).

## V.  DISCUSSION

Quinto argues that the Commissioner's Decision should be reversed or remanded for three reasons.  First, he argues that the ALJ failed to consider his use of a nebulizer in determining his residual functional capacity ("RFC").  See Memorandum in Support of Motion for Order Reversing the Commissioner's Decision ("Mot. to Reverse Mem.") (Doc. No. 19-1) at 12.  Second, he argues that the ALJ erred in failing to give controlling weight to the treating source opinion of Dr. Behjet.  See id. at 18.  Finally,

Quinto argues that the ALJ erred in determining that his RFC permitted occasional exposure to fumes, odors, dusts, gases, and poor ventilation. See id. at 23.

The court addresses first Quinto's first and third arguments pertaining to the ALJ's RFC determination and then addresses the ALJ's application of the treating source rule to Dr. Behjet's opinion. Because the court finds that the ALJ's failure to address Quinto's nebulizer use is sufficient to justify remand, it also suggests that the ALJ to revisit the other issues on remand, without finding it necessary to hold that such errors would themselves warrant remand on their own. See, e.g., Fly v. Colvin, No. 3:14-CV-1840, 2015 WL 5124957, at *5 (N.D. Ind. Aug. 31, 2015) (requiring the ALJ to revisit its credibility determination without finding that the error itself required remand because the case was already being remanded for other reasons); Waltemire v. Colvin, No. 13-CV-1283-DDC, 2014 WL 3809189, at *12 (D. Kan. Aug. 1, 2014); Lowe v. Colvin, No. 2:12-CV-524-PRC, 2014 WL 4373637, at *8 (N.D. Ind. Sept. 3, 2014).

D.    ALJ's Failure to Address Quinto's Use of the Nebulizer in the RFC

Section 404.1520 of title 20 of the Code of Federal Register ("CFR") lays out a five-step sequential evaluation process for determining whether an individual claimant is disabled or not. 20 C.F.R. § 404.1520 (2017). If, as here, the ALJ determines at step three that the claimant's impairments do not meet or equal any listing, the ALJ must determine the claimant's residual functional capacity ("RFC"). See Petrie v. Astrue, 412 Fed. App'x 401, 404 (2d Cir. 2011). Section 404.1545 defines the RFC as "the most [the claimant] can still do despite [his or her] limitations." 20 C.F.R. § 404.1545(a)(1) (2017). The ALJ then analyzes at step four whether the claimant's RFC permits him to perform his past work, and at step five whether there exist other jobs in the national

economy that the claimant can perform with his RFC, age, education, and work

experience.  See Petrie, 412 Fed. App'x at 404.

In this case, the ALJ assessed Quinto with the following RFC:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can frequently climb ramps and stairs but never ladders ropes or scaffolds.  He can occasionally stoop, kneel, crouch, and crawl.  The claimant can have occasional exposure to extreme cold, odors, dust, fumes, and pulmonary irritants but no exposure to unprotected heights or moving mechanical parts.  He can perform simple, routine tasks and his judgment is limited to simple, work-related decisions.  The claimant can only deal with changes in the work setting when they are limited to simple work related decisions.

Tr. at 25.  Quinto argues that, in formulating the above RFC, the ALJ erred in failing to

discuss the evidence that Quinto needed to use a nebulizer every four to five hours,

which would require him to take additional breaks during the workday.  See Mot. to

Reverse Mem. at 12.

In determining the RFC, the ALJ must consider "all the relevant medical and

other evidence."  20 C.F.R. § 404.1545; see also 20 C.F.R. § 404.1529(c)(3) (2017).

This includes the "effects of treatment, including limitations or restrictions imposed by

the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine,

side effects of medication)."  Social Security Ruling 96-8p, Titles II and XVI: Assessing

Residual Functional Capacity in Initial Claims ("SSR 96-8p"), 1996 WL 374184, at *5

(July 2, 1996).  Specifically, courts have found that the ALJ must consider, inter alia, the

extent to which the frequency or duration of treatment requires the claimant to be

absent from or take breaks during the typical workday.  See Griffin v. Comm'r of Soc.

Sec., No. 2:15-CV-13715, 2017 WL 991006, at *2 (E.D. Mich. Mar. 15, 2017)

("Absenteeism due to the frequency of treatment is a relevant factor so long as the treatment is medically necessary and concerns the conditions on which the disability claim is founded."); Thornton v. Colvin, No. CV 15-0407, 2016 WL 1136627, at *13 (E.D. La. Feb. 29, 2016), report and recommendation adopted, No. CV 15-0407, 2016 WL 1110231 (E.D. La. Mar. 22, 2016) ("The Fifth Circuit has held that if an individual's medical treatment interrupts her ability to perform a normal, eight hour workday, then the ALJ must determine whether the effect of treatment precludes the claimant from engaging in gainful activity." (citing Newton v. Apfel, 209 F.3d 448, 459 (5th Cir.2000)).

Additionally, the ALJ is required to articulate the reasons for the RFC determination, which "must include a narrative discussion describing how the evidence supports each conclusion." SSR 96-8p at *7. The Commissioner correctly notes that the ALJ is not required to discuss every piece of evidence. See Lowry v. Astrue, 474 Fed. App'x 801, 805 (2d Cir. 2012); Mongeur v. Heckler, 722 F.2d 1033, 1040 (2d Cir. 1983). However, even the cases cited by the Commissioner require that the court be able to "glean the rationale" of the ALJ's decision. Lowry, 474 Fed. App'x at 805; Mongeur, 722 F.2d at 1040.

Where the ALJ has made no findings about the limitations caused by the claimant's need for treatment, courts have remanded because it is not the role of the court to speculate as to the ALJ's rationale. See Griffin, 2017 WL 991006, at *3 ; Konoloff v. Comm'r Soc. Sec., No. 1:14-CV-00338-SLC, 2016 WL 1237884, at *10 (N.D. Ind. Mar. 30, 2016) (stating that, where the ALJ was silent, the court could not discern whether the ALJ had rejected the evidence of the claimant's nebulizer use or merely forgotten it); Holland v. Apfel, No. 95-7937, 1998 U.S. Dist. LEXIS 15674, at

*18–19 (E.D. Pa. Feb. 23, 1998), approved and adopted, 1998 U.S. Dist. LEXIS 5891

(E.D. Pa. Apr. 28, 1998).  Nor should the court "accept . . . counsel's post hoc

rationalizations for agency action."  Pickett v. Colvin, No. 3:13-CV-1295 (JCH), 2015 WL

1321017, at *3 (D. Conn. Mar. 23, 2015) (quoting Snell v. Apfel, 177 F.3d 128, 134 (2d

Cir.1999)); see also Posey v. Comm'r of Soc. Sec., No. 6:14-CV-1048-ORL, 2015 WL

2130911, at *5 (M.D. Fla. May 6, 2015).

Following this line of reasoning, some courts have specifically held that the ALJ's

failure to consider and address the claimant's need to use a nebulizer during the

workday in the RFC determination was sufficient reason for remand.  See Klitz v.

Barnhart, 180 Fed. App'x 808, 809–10 (10th Cir. 2006); Konoloff, 2016 WL 1237884, at

*10–11; Murphy v. Astrue, No. CIV-09-170-JHP-SPS, 2010 WL 5653829, at *4 (E.D.

Okla. Sept. 15, 2010), report and recommendation adopted, No. CIV-09-170-JHP-SPS,

2011 WL 288910 (E.D. Okla. Jan. 27, 2011); Smith v. Astrue, No. 1:10-CV-163-TLS,

2011 WL 3922465, at *6–7 (N.D. Ind. Sept. 7, 2011); Prather v. Astrue, No. CIV.09-

0437-HE, 2010 WL 3731184, at *3–4 (W.D. Okla. Sept. 8, 2010).

The Commissioner argues, however, that the ALJ did not err by failing to discuss

Quinto's use of the nebulizer because the evidence in the record was insufficient to

support his allegations as to its necessity and frequency.  See Memorandum in Support

of Motion for Order Affirming the Commissioner's Decision ("Mot. to Affirm Mem.") (Doc.

No. 20) at 3–5.  Supporting the Commissioner's argument, some courts have held that

the ALJ's failure to include the claimant's use of a nebulizer in the RFC was not in error

where the claimant failed to provide sufficient medical evidence of its use.  See

Spaulding v. Astrue, No. CI-V. 08-757-M, 2009 WL 1874174, at *4 (W.D. Okla. June 26,

2009), rev'd and remanded on other grounds, 379 Fed. App'x 776 (10th Cir. 2010); Howard v. Colvin, No. 114CV00856TWPMJD, 2016 WL 1127882, at *7 (S.D. Ind. Mar. 23, 2016); Stitely v. Comm'r, Soc. Sec. Admin., No. SAG-14-144, 2014 WL 5834700, at *2 (D. Md. Nov. 10, 2014), aff'd sub nom. Stitely v. Colvin, 621 Fed. App'x 148 (4th Cir. 2015); MacPherson v. Astrue, No. C10-0163, 2011 WL 5875742, at *13 (N.D. Iowa Nov. 22, 2011).

In comparing these cases to those cited earlier resulting in remand, the court recognizes that it is not clear where exactly the line is drawn, marking how much evidence is sufficient such that the ALJ's failure to address the nebulizer use would be in error. For example, in some cases, courts have found to be insufficient the claimant's hearing testimony alone without additional medical evidence, especially when the claimant is found to be less credible. See Garrett v. Colvin, No. 5:14CV1066, 2015 WL 3828260, at *13–14 (N.D. Ohio June 17, 2015); Freeman v. Astrue, No. 4:10-CV-04100, 2011 WL 2983184, at *4 (W.D. Ark. July 22, 2011). Other courts have found sufficient for remand evidence of a prescription for the nebulizer, coupled with the claimant's testimony about its frequency of use. See Murphy, 2010 WL 5653829, at *4; Smith, 2011 WL 3922465, at *6.

In this case, Quinto testified at the hearing before the ALJ that he had been using the nebulizer every four to five hours, or twice a day, since 2002. See Tr. at 141. On some days, he used it every three hours depending on need. See id. at 170. He testified that he needed 35 to 40 minutes each time to set up and use the nebulizer, which would require an additional 30 minutes beyond the 15-minute break employees normally receive. See id. at 169. The vocational expert, Dr. Sacks, then testified that

using the nebulizer at least once, maybe twice, every day would require Quinto to be off task for 10 percent of the workday and would preclude all jobs.  See id. at 165, 172.

In addition to his own testimony, Quinto also points to medical evidence in the record documenting his prescription for the nebulizer.  Specifically, in Dr. Caminiti's consultation notes, he prescribed on various dates that Quinto continue using the "Albuterol Sulfate Nebulization Solution, (2.5 MG/3ML) 0.083%, 3 ml as needed, Inhalation, every 4 hours."  Id. at 697 (November 17, 2011); id. at 720 (September 20, 2013); id. at 723 (March 26, 2014); id. at 726 (October 7, 2014); id. at 733 (April 7, 2015).  The prescription is also reflected in Dr. Behjet's treatment notes on November 7, 2014, as "Nebulizer 3-4 times a day."  Id. at 602; see also id. at 511 (including Quinto's self-report to the SSA of a prescription from Dr. Behjet for Albuterol "4 times a day" using a nebulizer).  Finally, his medication records indicate that he filled a prescription for Albuterol on October 18, 2014, November 20, 2015, January 10, 2016, January 14, 2016, and March 30, 2016.  See id. at 514–21.

The court finds that this record sufficiently distinguishes this case from those in which the ALJ's silence was not in error because of insufficient evidence of the claimant's use of the nebulizer.  In contrast to Spaulding, Quinto had a prescription for the medication.  Cf. Spaulding, 2009 WL 1874174, at *4 (finding that the ALJ did not err where "nothing in the medical record supports the assertion that a nebulizer was medically prescribed, medically recommended, or deemed medically necessary by Plaintiff's treating physicians").  Additionally, Quinto's hearing testimony is consistent with medical evidence in the record, including Dr. Caminiti's prescription.  Cf. Garrett, 2015 WL 3828260, at *13 (finding that the ALJ did not err where the claimant's

testimony was found "not entirely credible" and was not supported by medical evidence in the record, but rather was contradicted by a treatment note as to the frequency of the nebulizer's use). Although Quinto's testimony and Dr. Caminiti's prescription differ slightly from Dr. Behjet's prescription, Dr. Behjet prescribed more frequent use, not less, thereby still supporting the claim that Quinto needed to use the nebulizer <u>at least</u> every four to five hours. Furthermore, Quinto's hearing testimony and the prescription refill records indicate that he was using the nebulizer treatment as directed. <u>Cf.</u> <u>Macpherson</u>, 2011 WL 5875742, at *13 (declining to remand where there was "no indication of how often she needed [the nebulizer], or used it" and some evidence that she was not using it continuously). Therefore, Quinto introduced sufficient evidence in the record that the ALJ should have discussed his nebulizer use in the RFC determination.

The Commissioner makes several specific arguments in his attempt to undermine this medical evidence. First, he argues that the medical source opinions do not include a limitation indicating that Quinto needed breaks from work to use the nebulizer. <u>See</u> Mot. to Affirm Mem. at 3–4 (citing Tr. at 185, 236, 736, 907, 909, 911–12, 914, 916). However, the silence of these opinions on the issue of the nebulizer does not defeat Quinto's argument, especially in light of the other evidence in the record supporting his use of the nebulizer. Notably, none of the medical source opinions indicated that the nebulizer treatments were not necessary. <u>See</u> <u>Konoloff</u>, 2016 WL 1237884, at *10 ("No medical expert of record opined that Konoloff's nebulizer treatments were unnecessary; consequently, it is impermissible for the ALJ to indulge in his own lay view of Konoloff's need, or lack thereof, for nebulizer treatments."). To the contrary, in addition to the parts of the record noted above, the Albuterol prescription is

noted repeatedly throughout the record as medication that the claimant was taking at the time.  <u>See, e.g.</u>, Tr. at 592, 704, 757, 799, 914, 916.

The Commissioner also briefly mentions Quinto's normal respiratory findings and continued smoking as support for the conclusion that Quinto does not need to use the nebulizer.  <u>See</u> Mot. to Affirm Mem. at 4.  However, the Commissioner does not further develop the argument for why either of these things should undermine his need for a nebulizer, making it difficult for the court to fully consider these arguments.  Normal respiratory findings do not necessarily contradict Quinto's need for a nebulizer because it may be his use of the nebulizer that contributes to the normal findings.  <u>See</u> <u>Begolke v. Astrue</u>, No. 06-C-445-C, 2007 WL 5555951, at *10 (W.D. Wis. June 7, 2007) ("The fact that plaintiff's asthma was ordinarily kept under adequate if not optimal control by medication, as the administrative law judge implied, does not undermine her testimony that she uses the nebulizer often; to the contrary, nebulizer treatments might have actually helped plaintiff avoid a visit to the emergency room or hospital.").  Additionally, to the extent that the Commissioner argues that the nebulizer may only be necessary as a result of the smoking, <u>see</u> <u>Freeman</u>, 2011 WL 2983184, at *4, the ALJ does articulate this as the reason for discounting Quinto's nebulizer use as the ALJ in <u>Freeman</u> did.  As noted previously, it would be inappropriate for the court to affirm on the basis of the Commissioner's post hoc rationalizations not raised by the ALJ, especially when the Commissioner's argument itself is not fully articulated and leaves the court to speculate as to the connection between Quinto's smoking and his nebulizer use.

The Commissioner also argues that Dr. Behjet's prescription of the nebulizer three to four times a day occurred when Quinto was suffering from acute upper

respiratory infection and therefore is not indicative of regular use.  See Mot. to Affirm

Mem. at 4; Humble v. Astrue, No. CIV-08-18-D, 2009 WL 203952, at *3 (W.D. Okla.

Jan. 26, 2009) (finding that "the record does not support a claim that Plaintiff was

required to use a nebulizer on a continuous, daily basis" because the treatment was

prescribed when the claimant had pneumonia).  However, there is no indication from Dr.

Behjet's notes that the nebulizer was prescribed as a result of the respiratory infection.

To the contrary, the prescription for the nebulizer is located in a paragraph discussing

his COPD while, under the heading for acute upper respiratory infection, Dr. Behjet

indicated only that Quinto should start taking PredniSONE tablets.  See Tr. at 602.

Further, unlike in Humble, other evidence in the record, including continued inclusion of

the nebulizer in lists of current medications and multiple refills of the prescription,

indicate that Quinto's use of the nebulizer was continuous, rather than a one-time

response to a temporary infection.  See id. at 514–21, 592, 704, 757, 799, 914, 916.

The Commissioner also argues that, because the prescription said "as needed,"

"every four hours" should be interpreted as the maximum approved use, not necessarily

implying that Quinto needed to use the nebulizer every four hours on a regular basis.

See Mot. to Affirm Mem. at 4; Howard, 2016 WL 1127882, at *7; Macpherson, 2011 WL

5875742, at *13.  Critically, however, the court is unable to discern whether the ALJ

adopted this reading of the prescription or merely forgot to consider the effect of the

nebulizer because the ALJ failed to mention the prescription for the nebulizer at all.

Additionally, Quinto testified at the hearing that he did use the nebulizer every four or

five hours, and the Commissioner has not pointed to evidence that contradicts that

testimony.  See Tr. at 141.

Instead, the Commissioner discredits Quinto's testimony as to his nebulizer use by arguing, "While Plaintiff did testify to using a nebulizer four to five times per day, the ALJ reasonably declined to credit him on this point, given the complete lack of evidence to corroborate the claim." See Mot. to Affirm Mem. at 4. The Commissioner does not, however, reference where in the decision the ALJ made this credibility determination "on this point." The ALJ does state that "the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." Tr. at 27. His discussion of the claimant's statements, though, does not mention the testimony as to his nebulizer use, nor does it point to specific evidence in the record contradicting such testimony.

"The ALJ is free to accept or reject the testimony of any witness, but a 'finding that the witness is not credible must nevertheless be set forth with sufficient specificity to permit intelligible plenary review of the record.'" Cogdell v. Colvin, No. 3:14CV1334 (HBF), 2017 WL 1159091, at *2 (D. Conn. Mar. 28, 2017) (quoting Williams ex rel. Williams v. Bowen, 859 F.2d 255, 260–61 (2d Cir. 1988)); see also Williams, 859 F.2d at 261 ("The failure to make credibility findings regarding the Williams' critical testimony fatally undermines the Secretary's argument that there is substantial evidence adequate to support his conclusion that claimant is not under a disability."). In at least two cases, courts have found that merely finding the claimant's testimony not credible generally or on other grounds, but without specifically addressing the testimony on nebulizer use, is insufficient to justify failure to include the use of the nebulizer in the RFC. See Konoloff, 2016 WL 1237884, at *9–10; Begolke v. Astrue, 2007 WL 5555951, at *10 (finding that neither of the reasons for discounting the plaintiff's testimony, both of which "concern[]

17

her asthmatic symptoms only broadly," "provides an adequate bridge between the nebulizer testimony and the administrative law judge's ultimate conclusion that the plaintiff was not disabled"). In <u>Konoloff</u>, the court stated:

> [T]he Commissioner infers that, because the ALJ found Konoloff not fully credible on other grounds, the ALJ must have chosen not to fully credit Konoloff's testimony about the extent of his nebulizer use. . . . But the ALJ's silence concerning Konoloff's nebulizer use in the RFC leaves the ALJ's intent unclear. The ALJ could have either intended to reject the frequency of Konoloff's nebulizer use, as the Commissioner urges, or he might have inadvertently overlooked Konoloff's nebulizer use when crafting the RFC and the hypotheticals.

<u>Konoloff</u>, 2016 WL 1237884, at *9–10. Likewise, here, the ALJ found Quinto generally not credible, but did not provide specific reasons for rejecting his allegations as to the frequency of his nebulizer use. Therefore, this general credibility assessment does not excuse the ALJ's failure to consider such evidence.

Finally, in addition to finding the Commissioner's arguments unpersuasive, the court notes that, even if the Commissioner had raised persuasive arguments undermining the medical evidence of Quinto's use of the nebulizer, these arguments would be post hoc rationalizations that the court is not bound to accept. <u>See</u> <u>Pickett</u>, 2015 WL 1321017, at *3. Under the applicable standard of review, the court would have upheld the ALJ's findings of fact as long as they were supported by substantial evidence. However, the ALJ here made no findings at all regarding Quinto's need for the nebulizer and did not support his Ruling with any of the arguments advanced by the Commissioner in his Motion to Affirm. Thus, the court could not affirm the ALJ's decision by relying on these post hoc arguments, even if they were more persuasive. <u>See</u> <u>Posey</u>, 2015 WL 2130911, at *5; <u>Prather</u>, 2010 WL 3731184, at *4.

18

In sum, the ALJ erred by failing to consider the evidence in the record that Quinto needed to use a nebulizer every four to five hours. The ALJ's error here is not harmless because the vocational expert, Dr. Sacks, testified that, at that frequency, "[t]hat alone would put them out of work." Tr. at 172; see also id. at 165 (testifying that use of a nebulizer once, maybe twice, a day would require Quinto to be off task 10 percent of the workday and thus preclude all jobs). If the ALJ found that Quinto's need for the nebulizer was substantiated, then, this could significantly alter his conclusion at step five. See Konoloff, 2016 WL 1237884, at *10–11; Smith, 2011 WL 3922465, at *7.

Accordingly, the case is **REMANDED** for the ALJ to make findings as to whether Quinto's use of the nebulizer is sufficiently supported by evidence in the record and whether the RFC should be adjusted to include a limitation reflecting its use. If he so determines, he should thus reconsider his conclusions at step four and five as appropriate.

E.    RFC Determination Permitting Occasional Exposure to Fumes, Odors, Dusts, Gases, and Poor Ventilation

Quinto additionally argues that the ALJ erred in concluding that his RFC permitted occasional exposure to fumes, odors, dusts, gases, and poor ventilation ("pulmonary irritants"). See Mot. to Reverse Mem. at 23–25. He claims that the ALJ's RFC finding ignores "uncontroverted medical evidence on record" that he should avoid all such pulmonary irritants. Id. at 24. Quinto argues that the ALJ was improperly "playing doctor" by "reject[ing] the medical opinion of all medical sources regarding the plaintiff's severe environmental limitations based on his own findings that the plaintiff's pulmonary condition has improved." Id. He further argues that the ALJ's reasons for rejecting the medical sources proscribing all exposure—that Quinto's COPD was stable

and his lungs were clear—were flawed because improved pulmonary condition does not necessarily mean he can now be exposed to irritants. See id. at 24. Rather, he argues that isolation from the irritants could have caused the improvement. See id.

The court first notes that it is not clear that the evidence on Quinto's permissible degree of exposure to pulmonary irritants is uncontroverted. Although there are a number of medical opinions in the record that indicate Quinto should avoid all pulmonary irritants, Dr. Golkar, a state medical consultant, states that Quinto should avoid "even moderate exposure" to such irritants. Tr. at 186. The Commissioner argues that avoiding even moderate exposure is not the same as avoiding all exposure. See Mot. to Affirm Mem. at 7. He asserts that the former permits exposure to less than moderate quantities of pulmonary irritants while the latter does not. See id. Thus, the Commissioner argues that the ALJ, rather than as playing doctor, as Quinto claims, can better be characterized as basing his decision on Dr. Golkar's medical opinion.

Although Dr. Golkar does not proscribe all exposure, he does recommend avoiding "even moderate exposure." Tr. at 186 (emphasis added). The use of the word "even," as opposed to merely "avoid moderate exposure," emphasizes the importance of limiting exposure and at least raises an ambiguity as to whether Dr. Golkar's recommendation would reasonably support a finding that occasional exposure would be permissible. In the face of such ambiguity, the ALJ should have sought clarification before relying on Dr. Golkar's opinion to reach an RFC at odds with the remaining medical opinions in the record.

Even if the court assumes that Dr. Golkar's opinion does support the ALJ's conclusion, and the evidence that Quinto should avoid all exposure to pulmonary

irritants is therefore not uncontroverted, the ALJ was then faced with conflicting medical opinions. The record contains multiple other medical sources that conclude that Quinto should avoid all exposure to pulmonary irritants. Dr. Richard Papantonio, another state medical consultant, opined that Quinto should "[a]void all exposure." Tr. at 236. Dr. Caminiti similarly concluded that Quinto "cannot be exposed to noxious chemicals, smells, odors, or respiratory irritants." Id. at 907. He justified these environmental restrictions by citing to medical findings of "[s]ignificant lung lesions; wheezing with exposure to the above," and opined that "[e]xposure to above examples will exacerbate his underlying pulmonary function."[2] Id. at 924. Treating physician Dr. Behjet and APRN Shawn Putnam also determined that Quinto could never be exposed to these pulmonary irritants. See id. at 934, 942.

When the record contains conflicting opinions, the court recognizes that "[i]t is for the SSA, and not this court, to weigh the conflicting evidence in the record." Mandro v. Berryhill, No. 3:16-CV-1137 (JCH), 2017 WL 4071104, at *15 (D. Conn. Sept. 14, 2017) (quoting Schaal v. Apfel, 134 F.3d 496, 504 (2d Cir. 1998)). "Because '[g]enuine conflicts in the medical evidence are for the Commissioner to resolve,' the ALJ was entitled to 'choose between properly submitted medical opinions' and to consider 'other substantial evidence in the record . . .' in determining [the claimant's] residual functional capacity." Johnson v. Berryhill, No. 3:16-CV-01050 (SRU), 2017 WL 2381272, at *6 (D. Conn. June 1, 2017) (citations omitted). However, "an ALJ's failure to reconcile materially divergent RFC opinions of medical sources is a ground for remand." Oliphant v. Astrue, No. 11-CV-2431, 2012 WL 3541820, at *16 (E.D.N.Y. Aug. 14, 2012).

---

[2] Dr. Caminiti's handwritten notes were difficult to read at places, and the above reflects the court's best understanding of their content.

In this case, the ALJ weighed the opinions of the five medical sources on exposure to irritants and assigned little weight to Dr. Behjet's and APRN Putnam's opinions, some weight to Dr. Papantonio and Dr. Golkar's opinions, and some weight, but less than the other opinions given some weight, to Dr. Caminiti's opinion. <u>See</u> Tr. at 32–37. This assignment of weight does not, however, fully reconcile the conflict in the evidence on the question of how much exposure to pulmonary irritants Quinto can withstand. The ALJ assigned the same weight, <u>i.e.</u> some weight, to both Dr. Papantonio's and Dr. Golkar's opinions, which reached different conclusions. From the ALJ's RFC determination that Quinto can withstand occasional exposure, the court deduces that he followed Dr. Golkar's opinion rather than Dr. Papantonio's (and, to a lesser extent, Dr. Caminiti's), but the ALJ does not explicitly articulate this thinking. In assigning some weight, he uses similar language to explain his assessment of both Dr. Golkar's and Dr. Papantonio's opinions—language that does not specifically address the evidence related to pulmonary irritants.[3] <u>See</u> Tr. at 32, 33. Therefore, it is difficult

_____

[3] In explaining the weight given to Dr. Papantino's opinion, the ALJ states:

> He also opined that the claimant should avoid concentrated exposure to extreme cold <u>and all exposure to fumes, odors, dusts, gases, poor ventilation, and other hazards</u>, such as machinery and heights. This is consistent with the treatment notes, which indicated that the claimant's lumbar spine revealed no spinal stenosis and normal alignment of the vertebral bodies without fracture or subluxation and there were no intradural findings.

Tr. at 32 (internal citations omitted) (emphasis added). In explaining the weight given to Dr. Golkar's opinion, the ALJ states:

> He opined that the claimant could frequently climb ramps and stairs, occasionally crouch and crawl, and should avoid concentrated exposure to the cold <u>and even moderate exposure to hazards likes [sic] fumes, odors, dusts, gases, and poor ventilation</u>. This is consistent with the treatment notes, which indicated the claimant's lumbar spine revealed no spinal stenosis and normal alignment of the vertebral bodies without fracture or subluxation and there were no intradural findings.

for the court to determine how the ALJ reconciled the opinions and whether his conclusion is thus supported by substantial evidence or not. This is especially true given that Dr. Golkar's opinion stands alone against the other four opinions.

The court need not decide whether the ALJ's failure to adequately articulate his reasons for how he reconciled the conflicting opinions itself requires remand. Given that the court is already remanding the case to the ALJ for reconsideration of the RFC determination as to Quinto's use of a nebulizer, the court instructs the ALJ to revisit this additional aspect of the RFC as well. See, e.g., Fly v. Colvin, No. 3:14-CV-1840, 2015 WL 5124957, at *5 (N.D. Ind. Aug. 31, 2015); Waltemire v. Colvin, No. 13-CV-1283-DDC, 2014 WL 3809189, at *12 (D. Kan. Aug. 1, 2014); Lowe v. Colvin, No. 2:12-CV-524-PRC, 2014 WL 4373637, at *8 (N.D. Ind. Sept. 3, 2014). Specifically, the ALJ should articulate how he reconciles the conflicting medical opinions about how much exposure to irritants Quinto can withstand. In doing so, he should provide reasons that make clear that his determination is supported by substantial evidence in the record. If he maintains the current RFC determination, it would also be prudent for the ALJ to address, in response to Quinto's argument, how improvement in his COPD leads to the conclusion that he can be exposed to occasional irritants.

F.    Assignment of Less Weight to Dr. Behjet's Opinion

Quinto finally argues that the ALJ erred in evaluating the treating source opinions of Dr. Behjet. See Mot. to Reverse Mem. at 18–23. Dr. Behjet provided one medical source statement on April 22, 2015, and another on January 22, 2016. See Tr. at 34,

_____

Id. at 33 (internal citations omitted) (emphasis added). Although the opinions reference different exposure levels, he does not differentiate between them, as the second sentence in both quotes is identical. Additionally, that sentence, supposedly indicating with what treatment notes the opinion is consistent, only addresses his back problem, not his exposure to irritants.

36–37.  The ALJ attributed some weight, but less than other opinions given some weight, to the April 2015 statement and little weight to the January 2016 statement.  <u>See id.</u>

The treating source rule requires that "[a] 'treating physician's' opinion is 'given controlling weight as long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'"  <u>Nieves v. Colvin</u>, No. 3:14-CV-01736, 2017 WL 1050569, at *4 (D. Conn. Mar. 20, 2017); <u>see</u> 20 C.F.R. § 404.1527(c)(2) (2017).  Thus, if the opinion "is not well-supported or is not consistent with the opinions of other medical experts that are sufficiently substantial evidence to undermine the opinion of the treating physician," the ALJ is not required to give the treating source controlling weight.  <u>Mariani v. Colvin</u>, 567 Fed. App'x 8, 10 (2d Cir. 2014), <u>as amended</u> (July 30, 2014).

If controlling weight is not given, "some weight may still be attached to that opinion, and the ALJ must still designate and explain the weight that is actually given to the opinion."  <u>Schupp v. Barnhart</u>, No. 3:02CV103 (WWE), 2004 WL 1660579, at *9 (D. Conn. Mar. 12, 2004).  The SSA provides a list of factors to be considered in assigning weight to the medical opinion: (1) examining relationship; (2) treatment relationship, including length, frequency of examination, and nature and extent of the relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors.  20 C.F.R. § 404.1527(c)(2)–(6) (2015).  The SSA's regulations provide, "We will always give good reasons in our notice of determination or decision for the weight we give [the] treating source's medical opinion."  20 C.F.R. § 404.1527(c)(2) (2015).  "[F]ailure to provide

good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." <u>Sanders v. Comm'r of Soc. Sec.</u>, 506 Fed. App'x 74, 77 (2d Cir. 2012) (citing <u>Schaal</u>, 134 F.3d at 505).

In this case, the ALJ's reason for not giving controlling weight to both of Dr. Behjet's opinions was that the opinions were inconsistent with the treatment notes. <u>See</u> Tr. at 34, 36–37. As cited by the ALJ, the April 2015 opinion stated that Quinto "was unable to function, needed to take unscheduled breaks every 10 minutes, would be off task 25% or more of the time, and could never twist," and the January 2016 opinion stated that Quinto "could never lift 10 pounds and could never balance, stoop, kneel, crouch or crawl." <u>Id.</u> The ALJ found that this was inconsistent with the treatment notes, which indicated no spinal stenosis of the lumbar spine, "normal alignment of the vertebral bodies without fracture or sublaxation," no intradural findings, negative straight leg raises, a steady gait, and improvement in his condition with physical therapy and compounding cream. <u>Id.</u> Further, the ALJ provided an additional reason for rejecting the January 2016 opinion's findings on Quinto's pulmonary health because the ALJ found that Quinto's COPD was stable by August 2015, and that his lungs were consistently clear. <u>See</u> <u>id.</u> at 37.

Quinto offers a number of arguments challenging the ALJ's reasons for discounting Dr. Behjet's opinions. First, he argues that the ALJ erred by not addressing whether Dr. Behjet's opinions were supported by medically accepted clinical and laboratory diagnostic techniques, the first prong of the test to determine whether a treating source opinion is deserving of controlling weight. <u>See</u> Mot. to Reverse Mem. at 19–20. Second, he challenges some of the ALJ's factual findings from the treatment

notes that the ALJ claimed were inconsistent with Dr. Behjet's medical opinion.  See id. at 20, 22–23.  Specifically, he argues that the ALJ incorrectly determined that Quinto did not suffer from spinal stenosis and that his condition was improving.  See id.  Finally, he argues that the ALJ improperly "played doctor" by interpreting the diagnostic evidence in the treatment record as inconsistent with Dr. Behjet's opinion.  See id. at 20–23.

The court directs its decision to Quinto's third argument.[4]  Quinto argues specifically that the ALJ erred in finding Dr. Behjet's opinions inconsistent with the treatment record because the ALJ interpreted the diagnoses himself rather than relying on medical opinion.  See Mot. to Reverse Mem. at 20–21.  In particular, Quinto challenges whether the ALJ understood what the complicated medical terms, such as "normal alignment of the vertebral bodies without fracture or subluxation" and "no intradural findings," actually mean.  See id. at 21.  This argument also extends to the other diagnostic findings that the ALJ cites, including "no spinal stenosis," "negative straight leg raises," and "steady gait."  Tr. at 34.

An ALJ is prohibited from "playing doctor" in the sense that "an ALJ may not substitute his own judgment for competent medical opinion."  Staggers v. Colvin, No. 3:14CV00717 SALM, 2015 WL 4751108, at *3 (D. Conn. June 17, 2015), report and recommendation adopted, No. 3:14-CV-717 JCH, 2015 WL 4751123 (D. Conn. Aug. 11, 2015) (quoting Lewis v. Comm'r of Soc. Sec., No. 6:00-CV-1225 (GLS), 2005 WL 1899399, at *3 (N.D.N.Y. Aug. 2, 2005)).  This rule is most often employed in the

---

[4] The court notes that consideration of the first two, notably weaker, arguments is unnecessary. Because the court is already requiring the ALJ on remand to articulate good reasons for the weight he assigns Dr. Behjet's opinions without cherry picking or playing doctor, the ALJ will likely need to replace the current flawed reasons with new ones that are based on substantial evidence in the record. Thus, further analysis of the flawed reasons to be replaced would be moot.

context of the RFC determination when the claimant argues either that the RFC is not supported by substantial evidence or that the ALJ has erred by failing to develop the record with a medical opinion on the RFC.  See, e.g., Dennis v. Colvin, 195 F. Supp. 3d 469, 473–74 (W.D.N.Y. 2016); Staggers, 2015 WL 4751108, at *3; Deskin v. Comm'r of Soc. Sec., 605 F. Supp. 2d 908, 911–13 (N.D. Ohio 2008).  In that context, "[w]here the medical findings in the record merely diagnose the claimant's exertional impairments and do not relate these diagnoses to specific residual functional capacities . . . the Commissioner may not make the connection himself."  Staggers, 2015 WL 4751108, at *3 (quoting Walker v. Astrue, No. 08–CV–0828(A)(M), 2010 WL 2629832, at *6 (W.D.N.Y. June 11, 2010)).  Thus, "the ALJ may not interpret raw medical data in functional terms."  Deskin, 605 F. Supp. 2d at 912.[5]

---

[5] The Commissioner argues that, "the Second Circuit has rejected the 'playing doctor' argument this year, holding that an ALJ can reach his or her conclusions without a supportive medical opinion." See Mot. to Affirm Mem. at 7–8.  After reviewing the three cases that the Commissioner cites for this proposition, the court characterizes their holdings not as an outright rejection of the "playing doctor" argument, but rather as a carve-out that permits the ALJ to look to the entire record, particularly the treatment notes, in certain cases where a medical opinion on the RFC is absent.

In Wright v. Berryhill, the court upheld the ALJ's RFC determination based on the medical findings of various physicians in the record.  Wright v. Berryhill, 687 Fed. App'x 45, 48–49 (2d Cir. 2017). The opinion does not mention a medical opinion specifically on RFC, nor does it explicitly reject the playing doctor argument.  In Johnson v. Colvin, the court also found that the ALJ's RFC determination was supported by substantial evidence in the record, including the claimant's own testimony and a letter from one of his doctors, such that the ALJ did not wrongly rely on his own lay opinion.  See Johnson v. Colvin, 669 Fed. App'x 44, 46 (2d Cir. 2016).  Finally, in Monroe v. Commissioner of Social Security, the case of the three that most directly addresses the issue, the ALJ rejected the treating physician's medical opinion on RFC and relied on his treatment notes instead.  Monroe v. Comm'r of Soc. Sec., 676 Fed. App'x 5, 7–9 (2d Cir. 2017).  The court nonetheless upheld the ALJ's RFC, even without a supporting medical opinion in the record, because the treatment notes constituted substantial evidence to support his determination.  Id.

Some district courts in the Circuit have subsequently adopted a narrower interpretation of the holdings of these cases than argued by the Commissioner here.  For example, some courts have distinguished Monroe by noting that the treatment record in that case was comprehensive and contained evidence relevant to functional capacity.  Those courts remanded in their own cases because "the ALJ here did not discuss treatment notes with any vocational or functional relevance when he formulated the RFC."  Morales v. Colvin, No. 3:16-CV-0003(WIG), 2017 WL 462626, at *3 (D. Conn. Feb. 3, 2017); see also Muhammed v. Colvin, No. 6:16-CV-06369(MAT), 2017 WL 4837583, at *4 (W.D.N.Y. Oct. 26, 2017) ("While in some circumstances, an ALJ may make an RFC finding without treating source opinion

However, Quinto raises the "playing doctor" argument in a different context from these cases. Rather than arguing that the ALJ played doctor in formulating the RFC, Quinto argues that the ALJ did so by discounting Dr. Behjet's treating source opinion based on his own interpretation of the diagnoses in the treatment record. See Mot. to Reverse Mem. at 20–22. Thus, this case differs from most cases in which the court has found that the ALJ improperly played doctor because, in many of those cases, there is often no medical opinion in the record on the RFC at all. See, e.g., Dennis, 195 F. Supp. 3d at 473; Palascak v. Colvin, No. 1:11-CV-0592 MAT, 2014 WL 1920510, at *8 (W.D.N.Y. May 14, 2014).

In the context of the treating physician rule, the Second Circuit has recognized that a treating source opinion's inconsistency with its own treatment notes and other treatment notes in the record can be good reason for giving less weight to the opinion. See Monroe v. Comm'r of Soc. Sec., 676 Fed. App'x 5, 7–9 (2d Cir. 2017); Negron v. Colvin, No. 15CV2515ADSAKT, 2017 WL 1194470, at *7 (E.D.N.Y. Mar. 31, 2017) ("The Second Circuit has repeatedly held that the ALJs may give a treating source's medical opinion less weight where it contradicts their own treatment notes."). Some courts have expressed that, in so discounting the treating source opinion, the ALJ has not played doctor, but has merely evaluated whether the opinion is supported by objective medical evidence, as the treating source rule requires. See Mason v. Comm'r

---

evidence, the RFC assessment will be sufficient only when the record is 'clear' and contains 'some useful assessment of the claimant's limitations from a medical source.'" (quoting Staggers, 2015 WL 4751123, at *3)); Milliken v. Berryhill, No. 1:16-CV-00297 EAW, 2017 WL 3208635, at *15 & *16 n.3 (W.D.N.Y. July 28, 2017). Thus, whether the ALJ has erred in formulating an RFC without an express medical opinion depends, at least in part, on the nature and extent of the treatment record relied on by the ALJ. This court therefore concludes that Second Circuit precedent still prohibits the ALJ from playing doctor by substituting his own interpretation for that of a medical source. However, the ALJ has not played doctor where the treatment notes contain an assessment of the functional limitations or other substantial evidence that sufficiently supports the ALJ's RFC determination.

of Soc. Sec. Admin., No. 1:06-CV-1566, 2012 WL 669930, at *6 (N.D. Ohio Feb. 29, 2012).

For example, in Negron v. Colvin, the court points to a number of inconsistencies supporting the ALJ's decision, including, inter alia, lack of any report of back pain until almost a year after the alleged inability to work, treatment records describing the back pain as "mild discomfort," and normal evaluations of gait, motor strength, straight leg raises, and other muscular tests. See Negron, 2017 WL 1194470, at *7; see also Deboer v. Colvin, No. 15-C-194, 2015 WL 6872344, at *14 (E.D. Wis. Nov. 9, 2015) (upholding the ALJ's decision to discount the physician's opinion that the claimant could not work because it was inconsistent with "plaintiff's neurological and musculoskeletal examinations on that date[, which] were almost entirely normal"); Rodriguez v. Colvin, No. A-13-CV-708-AWA, 2015 WL 1726974, at *5 (W.D. Tex. Apr. 15, 2015) (upholding the ALJ's decision to discount the physician's letter, which noted "persistent pseudoaneurysm and debility of right groin and leg pain" and concludes that "functional capacity remains limited," because the treatment notes from the examination indicated that the claimant denied having any symptoms).

However, other courts have found that the ALJ erred by discounting the treatment source opinion as inconsistent with the treatment notes when doing so required the ALJ to interpret the medical data in the treatment notes himself. See Amarante v. Comm'r of Soc. Sec., No. 16CV00717RJSBCM, 2017 WL 4326014, at *10–11 (S.D.N.Y. Sept. 8, 2017), report and recommendation adopted, No. 16-CV-717 (RJS), 2017 WL 4326525 (S.D.N.Y. Sept. 26, 2017); Ellis v. Berryhill, No. 16-CV-6317-FPG, 2017 WL 2531716, at *3–4 (W.D.N.Y. June 12, 2017); Primes v. Colvin, No. 6:15-

CV-06431(MAT), 2016 WL 446521, at *3–4 (W.D.N.Y. Feb. 5, 2016). For example, in Ellis v. Berryhill, the ALJ's reason for not crediting the treating source opinion was that the opinion was inconsistent with the treatment notes "showing good recovery after [the claimant's] hospitalization." Ellis, 2017 WL 2531716, at *3. The court found that this inconsistency was not a "good reason" for rejecting the treating source opinion because the ALJ "improperly used his lay opinion to interpret complex medical data." Id. at *3. Specifically, the court stated, "The report that the ALJ relies on contains complex findings and it is unclear to the Court how the ALJ, who is not a medical professional was able to determine that these results provided a sufficient basis for discounting Dr. Bavibidilla's opinion." Id. at *4. Similarly, in Primes v. Colvin, the court held that it was improper for the ALJ to conclude that the claimant "walks a reasonable amount during the day" based on medical findings of strength in his lower extremities or that he "has not generally received the type of medical treatment one would expect from a totally disabled individual." Primes, 2016 WL 446521, at *4; see also Amarante, 2017 WL 4326014, at *10–11.

In this case, however, the court finds that the ALJ improperly substituted his own expertise and interpretation for that of the treating physician's by cherry picking the evidence from the treatment notes and interpreting the complex diagnostic evidence himself. First, the court notes that the ALJ cited only those portions of the treatment record that indicate no abnormalities and ignored the portions of the record that identify Quinto's disability.[6] "The fundamental deficiency involved with 'cherry picking' is that it

---

[6] "Cherry picking" is defined as "improperly crediting evidence that supports findings while ignoring conflicting evidence from the same source." Rodriguez v. Colvin, No. 3:13CV1195(DFM), 2016 WL 3023972, at *2 (D. Conn. May 25, 2016) (quoting Dowling v. Comm'r of Soc. Sec., No. 5:14–CV–0786 (GTS)(ESH), 2015 WL 5512408, at *11 (N.D.N.Y. Sept. 15, 2015)).

suggests a serious misreading of evidence, or failure to comply with the requirement that all evidence be taken into account, or both . . . ."  Id.  The ALJ is not permitted to cherry pick from the treatment record only evidence that is inconsistent with the treating source's opinion in order to conclude that the opinion should be accorded less weight. See Ortiz v. Colvin, No. 3:15-CV-00956 (SALM), 2016 WL 4005605, at *6 (D. Conn. July 26, 2016).

In this case, the ALJ cited from an MRI report, noting that Quinto showed "no spinal stenosis," but made no reference to the other comments in the same report that he presented with "mild to moderate disc degeneration . . . with moderate disc herniation" and "mild mass effect upon the left L5 nerve root in the lateral recess."  Tr. at 610.  Similarly, the ALJ cited Dr. Behjet's radiology report for the portions where he stated "normal vertebral body alignment" and "no evidence of fracture or vertebral subluxation," but ignored the portions of the report that stated "minor degenerative end plate spur formation" and "mild disc degeneration."  Id. at 611.  Finally, where the ALJ cites negative straight leg raises and steady gait, he ignores notes in the same report of "mild discomfort with range of motion of the left hip," "approximately 12 [degrees] scoliosis at the lumbrosacral junction," "loss of lumbar lordosis," "disc space narrowing at multiple levels throughout the lumbar spine," and "lumbar spine with degenerative changes."  Id. at 676.  Thus, the court finds that the ALJ erred by focusing only on the portions of the treatment record that indicate no abnormality and ignoring those portions with negative findings.  See Ellis, 2017 WL 2531716, at *4.  This cherry picking is particularly problematic given that the ALJ determined at step two that Quinto's degenerative disk disorder is a severe impairment.  See Tr. at 23.

Considering the entire treatment record as a whole, then, the court cannot find that there is substantial evidence to support the ALJ's conclusion that Dr. Behjet's opinion is inconsistent with the treatment record and should therefore be accorded less weight. In contrast to cases in which even a lay opinion would recognize that the treatment record contradicts the medical opinion, such as where the record shows no symptoms or almost entirely normal test results, see Rodriguez, 2015 WL 1726974, at *5; Deboer, 2015 WL 6872344, at *14, the treatment record here is instead mixed. The court agrees with Quinto that the ALJ likely lacks the medical expertise to comprehend the complex medical terms quoted above from the MRI and radiology reports, let alone to analyze their combined effect on his functional limitations. It was improper, then, for the ALJ to determine that the radiological reports and diagnostic tests in the treatment record were inconsistent with Dr. Behjet's conclusions that Quinto could never lift ten pounds, balance, stoop, kneel, crawl, crouch, or twist; that Quinto needed unscheduled breaks every ten minutes; or that Quinto would be off task 25% or more the time. Such a determination would have required the ALJ to translate Quinto's diagnoses into an assessment of his functional limitations, which is generally inappropriate for the ALJ to do on his own. See Staggers, 2015 WL 4751108, at *3.

Because the ALJ's reasons resulted from cherry picking and from substituting his own lay opinion for that of the medical source, the ALJ has failed to state good reasons for discounting Dr. Behjet's opinion. As noted previously, failure to provide good reasons for the weight given to the treating physician is grounds for remand. See Morgan v. Colvin, 592 Fed.Appx. 49, 50 (2d Cir. 2015). In some cases, courts have nonetheless affirmed the ALJ's decision and found that the ALJ "applied the substance

of the treating physician rule," even without expressly addressing the factors in 20 C.F.R. § 404.1527(c)(2)–(6), as long as "the Court 'deduce[s] that the ALJ considered the treating physician's opinion and explained the consistency of [the treating physicians'] opinion[s] 'with the record as a whole.'" Negron, 2017 WL 1194470, at *8. Because the case is already being remanded to the ALJ for other reasons, the court need not attempt to speculate as to whether it can determine the ALJ's rationale from the evidence in the record.[7] On remand, the ALJ is advised to weigh Dr. Behjet's medical opinions in light of the entire record and articulate good reasons for the weight he assigns them. See Fly v. Colvin, No. 3:14-CV-1840, 2015 WL 5124957, at *5 (N.D. Ind. Aug. 31, 2015); Waltemire v. Colvin, No. 13-CV-1283-DDC, 2014 WL 3809189, at *12 (D. Kan. Aug. 1, 2014); Lowe v. Colvin, No. 2:12-CV-524-PRC, 2014 WL 4373637, at *8 (N.D. Ind. Sept. 3, 2014).

---

[7] The court acknowledges that there are other medical sources in the record that opine on Quinto's functional limitations and reach different conclusions than Dr. Behjet does. See, e.g. Tr. at 32 (assigning some weight to Dr. Papantonio, who opines that Quinto can occasionally life 20 pounds, stoop, kneel, crouch, or crawl); id. at 33 (assigning some weight to Dr. Golkar, who opines that Quinto can occasionally carry 50 pounds; can frequently balance, stoop, and kneel; and can occasionally crouch and crawl); id. at 36 (assigning some weight to Dr. Caminiti's medical assessment of ability to do work-related activities, which opined that Quinto can occasionally climb, balance, stoop, crouch, kneel, and crawl); but see id. at 36 (also noting that Dr. Caminiti's medical assessment of ability to do work-related activities found that Quinto can lift 5 pounds and that he would require interruptions every 15 minutes); id. at 37 (assigning little weight to APRN Putnam's statement, which opined that Quinto could never stoop, kneel, crouch, or crawl).

While the opinions of other medical experts can be substantial evidence for discounting the treating source opinion, see Correale-Englehart v. Astrue, 687 F. Supp. 2d 396, 427 (S.D.N.Y. 2010), the ALJ here does not articulate this as his reason for assigning only some and little weight respectively to each of Dr. Behjet's opinions. See Tr. at 34–37. Nor does the ALJ consider the other relevant factors for weighing the opinion, such as the length and nature of the treatment relationship, whether Dr. Behjet was a specialist, or the evidence supporting his opinion. See 20 C.F.R. § 404.1527(c)(2)–(6) (2015). Although there may be evidence in the record contradicting Dr. Behjet's opinion, then, the court cannot ascertain whether and how the ALJ considered this against the evidence in support of Dr. Behjet's opinion. Thus, it is not obvious to the court whether the substance of the treating source rule was adequately applied. Because the case is already being remanded on other grounds, the ALJ will have another opportunity to satisfy his obligation to articulate "good reasons" for the weight he assigns to Dr. Behjet's treating source opinion. The court finds it prudent to allow him the chance to do so rather than to undertake the difficult task of parsing whether the ALJ's unwritten rationale is supported by substantial evidence.

**VI.      CONCLUSION**

For the reasons stated above, the Motion for Order Reversing the

Commissioner's Decision is **GRANTED**, and the Motion for Order Affirming the Decision

of the Commissioner is **DENIED**.  The case is remanded to the ALJ for proceedings

consistent with this decision.  The Clerk's Office is instructed that, if any party appeals

to this court the decision made after this remand, any subsequent social security appeal

is to be assigned to the District Judge who issued this Ruling.

**SO ORDERED.**

Dated at New Haven, Connecticut this 1st day of December, 2017.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge